IN THE TENNESSEE COURT OF CRIMINAL APPEALS

AT NASHVILLE

AUGUST SESSION, 1998

FILED

April 8, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| BYRON LEWIS BLACK, | ) | |
| | ) | |
| Appellant, | ) | No. 01C01-9709-CR-00422 |
| | ) | |
| v. | ) | Davidson County |
| | ) | |
| STATE OF TENNESSEE, | ) | Honorable Walter C. Kurtz, Judge |
| | ) | |
| Appellee. | ) | (Post-Conviction - Death Penalty) |

For the Appellant:

Donald E. Dawson
Post-Conviction Defender

Paul N. Buchanan
Post Conviction Defender
1320 Andrew Jackson Building
500 Deaderick Street
Nashville, TN 37243

For the Appellee:

John Knox Walkup
Attorney General of Tennessee

Michael E. Moore
Solicitor General

Kenneth W. Rucker
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General

John Zimmermann
Assistant District Attorney General
Washington Square, 222 2nd Ave. N.
Nashville, TN 37201-1649

OPINION FILED: _____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The petitioner, Byron Lewis Black, appeals as of right from the order of the Davidson County Criminal Court denying him post-conviction relief for three first degree murder convictions and one burglary conviction he received in 1989. The petitioner was sentenced to death for one of the murders with the jury finding six aggravating circumstances to be applicable. He received consecutive life sentences for the other two murders and a fifteen-year sentence for the burglary. The judgments of conviction were affirmed on direct appeal. State v. Black, 815 S.W.2d 166 (Tenn. 1991). The petitioner presents the following issues for review:

> (1) Did the trial court err by excluding a convicting trial juror's testimony proffered for the purpose of showing the effect of the ineffective assistance of counsel claimed by the petitioner to have occurred?
>
> (2) Did the trial court err by concluding that the petitioner received the effective assistance of counsel at trial and on appeal?
>
> (3) Did the trial court deny the petitioner a full and fair post-conviction hearing by refusing the petitioner more preparation time and by restricting the use of expert services?
>
> (4) Was the aggravating circumstance dealing with the murder being especially heinous, atrocious and cruel, T.C.A. § 39-2-203(i)(5), applied in an unconstitutional fashion?
>
> (5) Is death by electrocution cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution?
>
> (6) Does the sentence of death violate the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Tennessee Constitution?

We affirm the judgment of the trial court.

The petitioner was convicted of killing his girlfriend, Angela Clay, and her two minor daughters, Lakeisha and Latoya, while on weekend furlough from jail, where he was serving two years for shooting Ms. Clay's estranged husband. The most damaging evidence against the petitioner was the ballistic evidence. The bullets

2

retrieved from the victims came from the same gun the petitioner used to shoot Ms.

Clay's husband. The facts surrounding the slayings are described by the Tennessee

Supreme Court in its opinion on direct appeal as follows:

> The police arrived at approximately 9:30 p.m. on Monday evening, March 28, 1988, and found no signs of forced entry into the apartment; the door was locked. Officer James was able to open a window after prying off a bedroom window screen. All the lights were off. He shined a flashlight into a child's room and saw a pool of blood on the bed and the body of a small child on the floor. He exited the room, and officers secured the scene.

> Investigation revealed the bodies of Angela and her nine year old daughter, Latoya, in the master bedroom. Angela, who was lying in the bed, had apparently been shot once in the top of the head as she slept and was rendered unconscious immediately and died within minutes. Dr. Charles Harlan, Chief Medical Examiner for Davidson County, testified that she was probably shot from a distance of six to twelve inches and that her gunshot wound was the type usually caused by a large caliber bullet.

> Latoya's body was found partially on the bed and partially off the bed, wedged between the bed and a chest of drawers. She had been shot once through the neck and chest. Blood on her pillow and a bullet hole in the bedding indicated she had been lying on the bed when shot. Dr. Harlan testified that she was shot from a distance of greater than twenty-four inches from the skin surface. The bullet path and type of shot indicated that death was not instantaneous but likely occurred within three to ten minutes after her being shot. Bullet fragments were recovered from her left lung. Both victims were under the bedcovers when they were shot.

> The body of Lakeisha, age six, was found in the second bedroom lying facedown on the floor next to her bed. She had been shot twice, once in the chest, once in the pelvic area. Dr. Harlan testified that she had died from bleeding as a result of a gunshot wound to the chest. She was shot from a distance of six to twelve inches and died within five to thirty minutes after being shot. Abrasions on her arm indicated a bullet had grazed her as she sought to protect herself from the attacker. Bullet holes and blood stains on the bed indicated that she was lying in bed when shot and had moved from the bed to the floor after being shot. There were bloody finger marks down the rail running from the head of the bed to the foot of the bed. The size of the wounds and the absence of bullet casings indicated that a large caliber revolver had been used to kill the victims.

> One projectile was collected from the pillow where Latoya was apparently lying at the time she was shot. Fragments of projectiles were collected from the wall above

3

> Angela's head; others were collected from the mattress where Lakeisha was found.
>
> The receiver from the kitchen telephone was found in the master bedroom. The telephone from the master bedroom was lying in the hallway between the two bedrooms. The Defendant's fingerprints were the only prints recovered from the telephones. Two of his fingerprints were found on the phone in the hallway, and one was on the kitchen telephone receiver found in the master bedroom.

Black, 815 S.W.2d at 171-72 (Tenn. 1991). The petitioner received the death penalty for the murder of Lakeisha Clay.

## POST-CONVICTION HEARING

Robert Skinner first represented the petitioner in the case for which he was serving time when he committed the present murders. The petitioner pled guilty to shooting Bennie Clay, the victim's husband, and received two years in the workhouse with weekend furloughs for work. Mr. Skinner testified that the petitioner's story and the victim's story in the earlier case differed in several respects: the petitioner claimed he shot at the victim twice, the victim claimed it was three times; the petitioner claimed he shot the victim while the victim was attempting to gain entry into the petitioner's residence, whereas the victim claimed he was shot as he was being chased by the petitioner. The court below allowed post-conviction counsel to inquire into this material only for the purpose of attempting to establish the petitioner's lack of memory.

Mr. Skinner testified that he received a telephone call from the police informing him that the petitioner was in custody for the three homicides in the present case and that the petitioner wanted to talk to him. He said that upon hearing about the nature of the case, he did not want to represent the petitioner. However, the assistant district attorneys persuaded him to talk to the petitioner while he was in custody. Upon arrival at the police station, Mr. Skinner discovered that the petitioner had already given the police a statement. He then talked to the petitioner and told him that if he wanted to make another statement and tell the truth, Mr. Skinner would make sure no one would

4

take advantage of him.  He testified, however, that he did not review the initial statement the petitioner gave.  The petitioner eventually gave another statement in Mr. Skinner's presence.

Mr. Skinner testified that he had only been associated with one previous case that involved a competency issue.  Regarding the petitioner's prior guilty plea, he testified that the petitioner understood he was facing more serious charges and knew the possible consequences of a trial on those charges.  Before the sentencing hearing on the guilty plea, Mr. Skinner saw the petitioner about five or ten times.  He testified that the petitioner thought he was justified in shooting Mr. Clay but appreciated the risk of going to trial on the other charges.  Mr. Skinner stated that the petitioner never seemed mentally abnormal and that the petitioner understood the judicial process, including the roles of the various participants.  He said that, in fact, the petitioner filled out the presentence report himself.  He did not see any signs indicating the petitioner was not competent to stand trial.  He said that the petitioner was extremely confident about himself.

Jeffrey DeVasher, Assistant Public Defender, was primarily responsible for preparing the appellate brief in the direct appeal of this matter.  Mr. DeVasher had been with the public defender's office since 1985.  Although this was his first death penalty appeal, he had been associated with fifteen jury trials and hundreds of other felony cases.  He testified that he was working on approximately ten other appeals at the same time as this one.  He testified that Patrick McNally and Ross Alderman, the trial attorneys, may have worked on a couple of the appellate issues.  Mr. DeVasher testified that he did not have much involvement with the issues assigned to the other attorneys nor did he have any involvement in the motion for new trial.

5

Mr. DeVasher testified that he remembered discussing the issue of the state's remark during closing that not imposing the death penalty for the killing of the children would be rewarding the petitioner. He did not recall the precise reason for not raising the issue on appeal, but he said that the lack of a contemporaneous objection to the argument at trial may have been a factor in the decision. He also did not recall if he considered raising this as part of an ineffective assistance of counsel claim. Mr. DeVasher testified that, based upon information provided by the petitioner's post-conviction counsel, he now would probably raise the issue as plain error.

Mr. DeVasher testified that he did not recall any particular reason why the transcript of the hearing on the motion to suppress the petitioner's statement to the police was not included in the record on direct appeal. His appellate brief, however, raised an ineffective assistance issue regarding the admission of the petitioner's statement. Also, he did not address the petitioner's competency to waive his rights regarding this statement.

Ross Alderman was employed by the Metropolitan Public Defender's Office and represented the petitioner at trial. He had previously represented clients charged with first degree murder but had never before been involved in a capital case. He said that three lawyers in the office had some capital case experience. He stated that he was probably involved with about thirty other cases at the time he was assigned to the petitioner's case. Mr. Alderman testified that he also began preliminary work on another capital case during the initial stages of the petitioner's case.

Mr. Alderman testified that he reviewed the two statements made by the petitioner, and he did not see any issue regarding the petitioner's request for a lawyer and his desire to keep talking to the police. Mr. Alderman said that the petitioner probably should not have continued to talk. At trial, however, that portion of the

6

statement after the petitioner made the request for his attorney was not admitted into evidence. Also, the defense attorneys were able to have the trial court exclude an eyewitness statement indicating that the petitioner's car was at the victim's residence past the time the petitioner said he was there. The petitioner's statement made when Mr. Skinner was present gave details about the crime scene and was admitted into evidence. Mr. Alderman testified that he thought this statement was very damaging to the petitioner's case.

Mr. Alderman testified that the first time he saw the petitioner, the petitioner did not seem too concerned about being charged with this serious offense. Mr. Alderman said he did not consider this significant at the time. He stated that the petitioner's demeanor stayed essentially the same throughout the trial. He stated that the petitioner's description of his background was sometimes inconsistent with what the records or other witnesses disclosed. Mr. Alderman testified that he and the petitioner did not communicate well. He said he could not get the petitioner to understand what he was saying. He stated that the petitioner was evaluated early in the process for competency and sanity.

Mr. Alderman testified that the two investigators assigned to the case discovered some social and family history from the petitioner and his family, but the investigators were unable to obtain the extent of information counsel wanted. The petitioner told them that he had relationships with other women at the time and that he was not obsessed with the victim. Mr. Alderman testified that the investigators never looked for these other women.

The defense team decided there may have been a mental health issue because a report from Dr. Kenneth Anchor, a psychologist, suggested that the petitioner may not have been competent, and the defense team was concerned about

7

the petitioner's refusal to discuss the issues of the case. Mr. Alderman stated that although he was aware the trial court did not always agree with Dr. Anchor's opinions, the defense team did not consider obtaining the services of another expert. He testified that there was no particular reason why they did not use both a psychologist and psychiatrist. He stated that Dr. Anchor was only one of a couple of mental health professionals available at that time. He testified that they did not explore to see if other experts were available. Mr. Alderman stated that they provided Dr. Anchor with the background information they had on the petitioner. Although he testified that he did not remember, Mr. Alderman admitted that it was possible that the only background information they provided came from the petitioner himself. Mr. Alderman testified that Mr. McNally had more contact with Dr. Anchor than he did. Mr. Alderman testified that Dr. Anchor's testing did not reveal anything that would have warranted further investigation into the petitioner's mental health status.

Mr. Alderman also testified that he thought there may have been an issue regarding the petitioner's competency, in part because whenever he discussed the case with the petitioner, the petitioner would smile and state that "God would protect him from the evidence." However, they were not certain they would be able to show the jury what they saw in the petitioner. Mr. Alderman noted that the petitioner determined during the voir dire that the prosecutor and one of the prospective jurors were Masons; apparently that particular prosecutor wore Masonic pins on his jacket lapel and tie. The petitioner consistently maintained his innocence throughout the trial. Mr. Alderman testified that despite some compelling evidence, such as the matching bullets, the petitioner never helped explain his position in relation to the evidence. Mr. Alderman stated that the petitioner seemed to minimize the seriousness of the offense and its consequences.

8

The defense ultimately relied upon an alibi. Mr. Alderman testified they were compelled to use this defense because the petitioner insisted he had an alibi and because he refused to discuss the evidence or other possible defenses. They knew they were going to have a problem with the alibi because of inconsistent statements. Mr. Alderman testified that although he did not necessarily think this was the best possible defense, they decided to "let [the petitioner] call the tune. Let's let him decide how he wants to go to hell in a hand basket." The petitioner's insistence on the alibi was one reason they raised the competency issue pretrial. Mr. Alderman testified that they attempted to portray the victim's estranged husband as a suspect and tried to show that the victim was obsessed with the petitioner. He said that they raised the competency issue again during voir dire.

During the trial, the state elicited testimony concerning the shooting of Benny Clay. Mr. Alderman testified that the parties had a meeting in chambers before trial, and the trial court ruled this information was inadmissible. Mr. Alderman stated that he objected as soon as he realized the state was asking improper questions about the incident. He also stated that he realized he should have filed a motion in limine despite the in-chambers conference on this matter.

Mr. Alderman testified there was no particular reason why he did not object to certain information contained in the petitioner's statements to the police that were read to the jury during trial, despite the fact that he agreed that the form of some of the questions contained in the statements would not have been proper at trial. He did not know why they did not object to the trial court's explanation of mental condition mitigation as "a serious mental disorder" during voir dire. He did not recall conducting any investigation into Benny Clay's background for impeachment purposes or speaking to the petitioner's employer at the time. Mr. Alderman testified that he could not think of a reason to object contemporaneously to the prosecutor's closing argument regarding

9

imposing death for the murder of the children.  He said that they did not raise the issue on appeal because they believed they had waived it by not contemporaneously objecting.

Mr. Alderman testified that under the circumstances, he believed they had sufficient time to prepare for trial.  He acknowledged that his subsequent experience would have better equipped him to investigate the social background of the petitioner for mitigation purposes.  He stated they did not proffer any bad mitigation, such as prior bad acts or drug use and abuse, to help explain why the murders occurred.  He testified that they met about five or six times with members of the petitioner's family.  He testified that they discussed the circumstances of this case with the family and asked if they could relate any of the petitioner's past behavior to help explain this case.  Mr. Alderman said that they also talked to the petitioner about his past relationships with women, but neither the petitioner nor his family could offer any historical information relevant to the present case.

Assistant Public Defender Patrick McNally served as co-counsel in the trial of this case.  He testified that he was probably working on about forty or fifty cases per month and averaged about three trials per month during the time he was assigned to this case.  However, he said he had only one other trial in the two months before the trial in this case.  He testified that he never complained to his supervisor about being overworked.  He said he was assigned to the petitioner's case about three months before the trial date.  He was primarily responsible for the penalty phase of the trial.  The defense had two investigators on this case, Charlsie Johnson and Steve Allen.  Mr. McNally remembered that the investigators complained about having too many cases to work.  However, he did not recall any time when the investigators could not perform a certain task for him.  He testified that he had previously tried three death penalty cases and had helped prepare for about three more, but he stated that this was the first death

10

penalty appeal in which he had been involved.  Mr. McNally also testified that he had attended at least four seminars on death penalty litigation.

Mr. McNally testified that he first met with Dr. Anchor concerning possible psychological issues several weeks before trial.  Mr. McNally testified that he did not provide Dr. Anchor with a social history of the petitioner prior to the examination.  He stated that the practice at that time was for the expert to gather his or her own social history.  Mr. McNally was aware that the information the petitioner provided to the state's psychologist before the competency hearing and the information he gave Dr. Anchor were somewhat different in that he told one that he had children and told the other that he did not.  Mr. McNally testified that they attempted to show any delusions the petitioner had through the testimony of Pat Jaros during the penalty phase.  Mr. McNally did not inform the experts that the petitioner's grades dropped from the sixth grade to the twelfth grade.

Mr. McNally testified that he never found or heard anything to explain why the petitioner committed these murders.  He talked to the petitioner's ex-wife concerning their relationship prior to trial, but he did not talk to any of the petitioner's other girlfriends.

Mr. McNally testified that they chose Dr. Anchor because he was someone with whom they previously had worked and he was one of a few experts willing to handle criminal trials.  He said that they chose a psychologist rather than a psychiatrist because he felt that psychologists communicated better to jurors.  Dr. Anchor testified at the competency hearing before trial but was unable to testify at trial due to a scheduling conflict.  As a result, the defense asked for a continuance, which was denied, but the court was willing to authorize funds for another expert.  Mr. McNally testified that due to time constraints, they decided to allow Pat Jaros, the psychological

11

examiner (not a licensed psychologist), to testify about the reports prepared by Dr. Anchor. They attempted to have her explain to the jury during sentencing that the petitioner would be a good inmate on a long-term basis.

Mr. McNally testified that in an attempt to establish that the petitioner and victim had a good relationship, he argued during trial that the petitioner cleaned the victim's car the Saturday before the murder. However, he testified that he did not recall any specific attempt to verify this information, such as calling witnesses.

Mr. McNally testified that he thought the petitioner was incompetent to stand trial. However, after expert testimony, the defense did not renew their motion to suppress the petitioner's statement to the police. Mr. McNally testified that he did not listen carefully to the state's rebuttal argument during closing and therefore did not object to the prosecutor's comment about giving the petitioner a "freebie" for the murder of the children. He stated that because this trial lasted longer than normal, he had to devote time out of court to his other cases.

Mr. McNally testified that he tried the penalty phase and Mr. Alderman tried the guilt phase in an effort to preserve their credibility with the jury. Mr. McNally stated that he and Mr. Alderman believed they were locked into the alibi defense because of the petitioner's insistence. He testified that they did not object to the court's explanation of mitigation during voir dire, but he stated that they did request the court not to instruct the jury that a serious mental disorder could be considered mitigation because they did not think they had proven that. Mr. McNally also commented on the fact that the petitioner made the connection regarding the prosecutor's and prospective juror's membership in the Mason organization.

12

Mr. McNally testified that he first met with the petitioner's family in early December. He also testified to the number of contacts he had before trial concerning mitigation witnesses. He said that the state never made an offer for a plea agreement nor did the defense ever initiate plea negotiations with the state. He said the petitioner would not have allowed them to negotiate.

James Makin, a criminal defense attorney from Texas, testified on behalf of the petitioner. Mr. Makin testified that in 1995, the State of Texas implemented a certification program for those attorneys interested in seeking appointments to indigent capital defendants. He said he had been involved in about seven capital cases since 1989 and was certified under the Texas program since 1995. He testified that the pursuit of a defense is the sole responsibility of the defense counsel. He further testified that he thought counsel's reliance on the alibi in this case was unreasonable, and they lost credibility with the jury. Mr. Makin stated that he disagreed with the supreme court's opinion on the direct appeal to the extent it found Mr. Skinner's representation effective. According to Mr. Makin, defense counsel were ineffective for failing to file a petition for rehearing, failing to request a hearing on the motion to suppress, failing to subpoena Dr. Anchor to testify at trial, pursuing an alibi when they knew ahead of time it was not solid, failing to object during the state's rebuttal argument, not contacting Dr. Anchor until after filing the motion to suppress the petitioner's statement, and failing to provide Dr. Anchor with the petitioner's social history.

Dr. Pamela Auble, a clinical neuropsychologist, testified on behalf of the petitioner at the evidentiary hearing. She stated that based upon the information she received on the petitioner's history, such as a high school football injury to the chest and the possibility that his mother drank during pregnancy, there were some other things that needed to be explored in the petitioner's case. Dr. Auble testified that she

13

administered several tests to the petitioner, including an I.Q. test, a test of the petitioner's ability to learn and remember, a test to determine if the petitioner was malingering, a test of mental flexibility, a test of language fluency, a naming test, tests of motor speed and dexterity, a complex test of the petitioner's ability to learn a word list, a geometric test, and several personality and emotional functioning tests.

Dr. Auble testified that she administered the tests to the petitioner with a preconceived notion that the petitioner may suffer from Ganzer's Syndrome, which is a dissociative syndrome where the patient detaches himself from reality. She was informed that the petitioner could not remember the events surrounding the murders and gave inconsistent information regarding his social history. From the tests, Dr. Auble determined that the petitioner was not malingering. The petitioner's intelligence was within the borderline range of functioning, in the fifth percentile. Dr. Auble testified that the petitioner tended to minimize his problems and repress negative feelings. Dr. Auble also testified that the petitioner had an idealized attachment to his ex-wife. Dr. Auble stated that the petitioner denied "anything could ever be wrong with him in his life."

Dr. Auble testified that her evaluation of patients consists of reviewing their test scores, conducting an interview with the patient, and reviewing information about the patient obtained from outside sources, such as a social history or evaluations from other professionals. Dr. Auble had serious concerns about the petitioner's competency and stated further testing needed to be done in this case before she could reach a final conclusion. She stated that she had serious reservations about the petitioner's ability to assist in his defense and to reason about his case, but she acknowledged that the petitioner understood the roles of the judge, jury and counsel. The tests she conducted revealed that the petitioner's mental capacities, functioning, memory and reasoning were not normal and needed to be further investigated for

14

possible brain damage. Dr. Auble recommended that the petitioner undergo an EEG and a MRI. If the EEG and MRI came out negative, she stated that they would have to look to another source for the problem. Also, she stated that a more complete social history would be necessary. She testified, however, that the petitioner did not suffer from Ganzer's Syndrome. She stated that the petitioner had the characteristics of a dissociative disorder and that he repressed or denied negative feelings or actions. She also believed the petitioner had a cognitive problem (organic disorder), but she could not specify what type of disorder. She stated nothing in the record indicated the petitioner had a stroke. She testified that amnesia could be a possibility. She disagreed with Dr. Anchor's opinion that the petitioner suffered from a delusional disorder.

Dr. Auble started working on this case on February 17, 1997. She did not listen to the petitioner's tape-recorded statement to the police, nor did she read the transcript. She testified that the petitioner did not know why he was in prison, other than having been charged with murder. He recalled specific circumstances about the Bennie Clay shooting but could not recall specific details about the murders. The petitioner told Dr. Auble that he was in prison when the murders occurred. The petitioner claimed that the police "railroaded" him with a "bunch of lies." Dr. Auble testified that the petitioner told her he did not think he had any mental problems. He told her he was "just waiting on the truth. Good things come to those who wait." Although she did not read or hear them, the petitioner's counsel informed Dr. Auble of the content of the petitioner's statements to the police in which he said that he was inside the victim's apartment and saw the bodies. She testified that she did not ask the petitioner about his statements to the police. She indicated that the petitioner's mental condition was such that he had repressed the events over the years and therefore could not recall the specific details as he did in his statements to the police. Dr. Auble

did not consider the conclusions reached by the experts before trial to be incorrect, but she would have liked to have had more information to be certain.

Dr. William Bernet, a licensed forensic psychiatrist, first interviewed the petitioner in 1992, and then again in 1997. He testified that he also reviewed reports from other experts that were compiled prior to trial, as well as the police records and other miscellaneous records. He stated that this case was much more complicated than most forensic evaluations because there was "some kind of significant limit to [the petitioner's] understanding" that required additional investigation. He stated that he relies upon the attorneys in complicated cases such as this to assist him in gathering a social history of the patient. In other cases, he would obtain the social history himself. Despite his initial diagnosis, he testified that the petitioner was not suffering from Ganzer's Syndrome.

Dr. Bernet did not believe the petitioner was malingering during his evaluations. According to Dr. Bernet, the petitioner repressed his past bad acts, including inconsequential things, and the only way Dr. Bernet became aware of this was due to the thorough social history provided by the petitioner's current counsel. He testified that without a complete history, it was very likely another expert could miss this diagnosis. He testified that there was a reasonable medical probability that the petitioner suffered from a mental disorder and that it was almost certainly a form of amnesia. He further testified, however, that the amnesia was not a "flat, dense absolute amnesia," rather "it has holes in it." In other words, the petitioner could remember some things but not everything. According to Dr. Bernet, this would have hampered the petitioner in assisting with his defense. He stated that there should have been a much more detailed evaluation in this case before the trial.

16

Dr. Bernet testified that he wanted to obtain a more sophisticated social history and conduct additional interviews in order to pinpoint the cause of the defect. He testified that usually the doctor would determine whether more information was needed with regard to the social history. However, he also testified that attorneys would sometimes provide the additional information, depending on the nature of the case. Also, Dr. Bernet testified that an EEG and MRI would be helpful in the diagnosis. Although he testified that certain persons diagnosed with amnesia could still be found competent, he stated that the petitioner's case was such that the amnesia could interfere with competence. Dr. Bernet testified that due to his condition, the petitioner would sometimes give contradictory answers to questions and that the petitioner would sometimes fabricate answers in order to please the interviewer.

During the interview with the petitioner, Dr. Bernet asked the petitioner what would help his case, and the petitioner responded, "Take the death sentence off." When asked why he gave a statement to the police, the petitioner answered that it was because the detective acted like he was going to shoot him. Dr. Bernet testified that he believed the petitioner made up a lot of answers as he went along.

Leon Taylor McLean employed the petitioner at his used car business while the petitioner was in the prison work release program. Mr. McLean testified that the petitioner was an excellent employee who never complained and always had a smile on his face. He testified that the petitioner never seemed confused about his position or who the boss was, and he never appeared to lose his temper. Mr. McLean stated that he saw the petitioner on a television news report after his arrest for the murders and thought it was very odd that he was smiling. He also testified that on the Saturday before the murders, he saw the petitioner talking with an African-American woman at his establishment and that the petitioner was cleaning a car while he talked to

17

the woman. Mr. McLean said that there did not appear to be any animosity between the petitioner and the woman.

Charlotte Denise Walden, a trial witness, testified at the evidentiary hearing that before testifying at trial, she had not been contacted by anyone representing the petitioner. She testified that she was subpoenaed to appear at the trial but she did not remember who subpoenaed her or which attorney called her to the witness stand. She stated that she did not talk to anyone before she walked into the courtroom, except the victim's sister. However, upon further questioning, Ms. Walden said that she was not certain whether the prosecutors or defense counsel spoke with her before the trial. She testified that shortly after the murders, a police officer and another gentleman whom she could not identify talked to her on two separate occasions.

Lynette Denise Black, the petitioner's ex-wife, testified for the petitioner. She said they were married from 1979 until 1984 and had one child together. She did not know the victim in this case. Ms. Black testified that she periodically talked to the petitioner after their divorce and that the petitioner continued to see their child. She said that the petitioner accepted the fact that they were divorced, but since his incarceration, she believed the petitioner talked as if they were still married. She testified that she talked to the petitioner several days after the murders, and the petitioner did not seem like himself. She testified that she thought the petitioner expected eventually to be released from prison. The petitioner and Ms. Black lived with his parents during their marriage. She never heard the petitioner's family mention that the petitioner suffered a head injury nor did she ever witness the petitioner act violently. Ms. Black testified that the petitioner wanted the divorce. She said he wanted to live with his parents, but she wanted a place of her own. She stated that the petitioner

18

called her after he was arrested to inquire about how she was doing. She asked about the murders, and the petitioner said that he did not commit them.

Finas C. Black, the petitioner's maternal uncle, also testified at the evidentiary hearing. He said he was about eight or nine when the petitioner was born, and the petitioner's mother lived with their parents at the time. Mr. Black said that the petitioner's mother did not work much and was usually at home with the children. He said that his parents disciplined the petitioner. He said that the petitioner's mother drank scotch on the weekends and drank during her pregnancy with the petitioner, as well as while she was breast-feeding. He also testified that there is a history of diabetes in the family.

Mary Black, the wife of Finas Black, testified that the petitioner was about four or five when she and Finas married. She testified that her mother-in-law was the petitioner's primary caretaker. She testified that the petitioner's mother drank scotch on the weekends. She had never known the petitioner's mother to have full-time employment. Alberta Black Crawford, the petitioner's maternal aunt, also testified that the petitioner's mother drank scotch on the weekends during her pregnancy.

"In post-conviction relief proceedings the petitioner has the burden of proving the allegations in his petition by a preponderance of the evidence." McBee v. State, 655 S.W.2d 191, 195 (Tenn. Crim. App. 1983).[1] Furthermore, the trial court's findings of fact and determinations of law are conclusive on appeal unless the appellate court determines that the evidence preponderates against the findings. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990).

---

[1]Because the petitioner filed his petition before May 11, 1995, it is governed by T.C.A. § 40-30-101 et seq. (repealed 1995), rather than the 1995 Post-Conviction Procedure Act. Under the current statute, the standard is "clear and convincing evidence." T.C.A. § 40-30-210(f) (1997).

After what the record reflects to be a thorough review of the original trial record, as well as the post-conviction hearing, the trial court found that the petitioner did not receive the ineffective assistance of counsel and found that there were no other errors of constitutional dimension. We agree.

## I. EXCLUSION OF JUROR'S TESTIMONY

At the evidentiary hearing, the petitioner attempted to introduce testimony from Joseph Preston Saling, who served as one of the jurors during the convicting trial. The trial court sustained the state's objection to exclude this testimony under Rule 606(b), Tenn. R. Evid., but allowed the petitioner to make an offer of proof. On appeal, the petitioner contends that this testimony should have been allowed to support his claim of ineffective assistance of counsel.

Mr. Saling testified that he voted to impose the death penalty on the one count in this case because he believed the state proved that the petitioner tortured the victim. However, he testified that he was not certain about the definition of the heinous, atrocious or cruel aggravating circumstance and asked the court for further instruction. Mr. Saling said that he did not think the victim was tortured under his own definition of torture, but he believed that the state satisfied the legal meaning of the aggravating circumstance. He believed that the petitioner did not deserve the death penalty, but he voted for it because he felt obligated to follow the mandates of the law. Mr. Saling testified that he would have given the same answers to questions asked during voir dire now as he did back then. He stated that despite his own beliefs, he would still follow the law. He testified that he was not sure that the other aggravating circumstances would have persuaded him to vote for the death penalty if the state did not prove the heinous, atrocious or cruel aggravator.

Rule 606(b), Tenn. R. Evid., precludes a juror from testifying or offering an affidavit "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotion as influencing that juror to assent to or dissent from the verdict." In Henley v. State, 960 S.W.2d 572 (Tenn. 1997), the Tennessee Supreme Court addressed this very issue. In Henley, a capital post-conviction case, the petitioner sought to introduce an affidavit from one of the trial jurors in support of his claim of ineffective assistance of counsel. The affidavit related to the jury's mindset concerning the refusal of the petitioner's mother to testify during the sentencing phase of the trial. The supreme court stated that "the juror's affidavit related to the precise subject matter about which a juror is strictly forbidden from testifying by Rule 606(b)." Id. at 581. The court held that this evidence "violates the express terms of Rule 606(b) and should not have been considered" in the post-conviction proceeding. Id. Accordingly, the trial court did not err in refusing to consider the juror's testimony in this case.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

In order for the petitioner to be granted relief on the ground of ineffective assistance of counsel, he must establish that the advice given or the services rendered were not within the range of competence demanded of attorneys in criminal cases and that, but for his counsel's deficient performance, the result of his trial would likely have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Rose, 523 S.W.2d 930 (Tenn. 1975). Furthermore, we may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Trial counsel may not be deemed ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276 (Tenn. Crim. App. 1980). The reviewing courts must indulge a strong

21

presumption that the conduct of counsel falls within the range of reasonable professional assistance. Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.

## A. Presentation of Alibi

The petitioner claims his counsel were ineffective for failing to investigate the alibi defense thoroughly. He asserts that further investigation would have revealed the futility of this defense, and he argues that more suitable defenses could have been advanced.

The petitioner states that trial counsel failed to substantiate the petitioner's story by not interviewing Ms. Walden or her house guests from the night of the murder. Counsel for the petitioner and the state attack each other's interpretation of the evidence in this respect. The petitioner argues that defense counsel would have discovered that the petitioner did not visit Ms. Walden after 10:00 p.m. the night of the murder, as he claimed, if they had merely talked to her and her house guests before trial. The state contends that there is nothing in the record to suggest that counsel did not interview these witnesses. The petitioner also contends that counsel's shortcomings regarding these witnesses not only destroyed the alibi defense but affected the petitioner's credibility during sentencing. At the evidentiary hearing, counsel testified that he believed Ms. Walden probably was interviewed prior to trial, but that he did not know specifically. Furthermore, although Ms. Walden initially testified that she spoke to no one before taking the witness stand, she later testified that she was uncertain whether she talked to counsel. At any rate, defense counsel specifically testified that the investigator assigned to this case would have been responsible for interviewing Ms. Walden prior to trial. Counsel also testified that this investigator was still employed with the public defender's office. Although the parties differ regarding the significance of the evidence presented, we believe that the petitioner failed to elicit this

information from an apparently available witness, the investigator. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

The petitioner also argues that counsel's failure to discover that the petitioner's mother previously gave the police a contradictory statement significantly hampered their defense. However, the petitioner has not proven by a preponderance of the evidence that defense counsel inadequately prepared this witness. Counsel testified at the evidentiary hearing that they were unaware of this tape-recorded statement until after the witness testified at trial. The trial transcript suggests counsel were surprised by this testimony. Moreover, this witness testified that she did not tell defense counsel that she had been recorded. Counsel testified that they did not knowingly place perjured testimony before the jury. The petitioner has failed to show that counsel were deficient in this respect. As the state suggests, counsel cannot be held responsible for the witness's failure to reveal relevant information. Counsel testified that they met with the petitioner's family several times before trial. Contrary to the petitioner's claim, there is nothing in the record to indicate counsel failed to "gain [their] trust and secure information from [them]."

The petitioner argues that because his counsel failed to investigate the alibi defense adequately, they lost the opportunity to present alternative defenses. He suggests that attacking the state's evidence in terms of establishing a reasonable doubt or even advancing an admission-based defense would have been superior to the alibi defense. Regarding the admission-based defense, the petitioner claims that counsel could have negated the requisite mens rea for first degree murder if they had adequately explored the petitioner's mental condition. As for a reasonable doubt defense, defense counsel testified at the evidentiary hearing that they did attempt to portray the victim's estranged husband as a suspect and show that the victim was obsessed with the petitioner. As for an admission-based defense, aside from the fact

23

that the petitioner denied committing the crimes, there is essentially no evidence that the petitioner was rendered incapable of forming the mental state required for first degree murder.

Counsel admitted the difficulties in pursuing a somewhat weak alibi defense, but they testified that they felt locked into this strategy because of the petitioner's wishes. Cf. Oscar Franklin Smith v. State, No. 01C01-9702-CR-00048, Davidson County (Tenn. Crim. App., June 30, 1998) (holding that although counsel pursued an alibi defense as requested by the defendant, despite the fact that counsel was not confident in the defense, counsel was not ineffective). The failure of a particular defense does not equate to ineffective assistance. See Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). This court must presume counsel acted reasonably, and it cannot review counsel's decisions solely through the benefit of hindsight. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). At the evidentiary hearing, Mr. Alderman testified that he believed that the defense team had sufficient time to prepare for trial under the circumstances. Despite the petitioner's claims regarding counsel's investigation, given the convicting evidence, he has failed to show how the outcome of the trial would have changed. Nothing regarding the circumstances surrounding the petitioner's presence at Ms. Walden's or his mother's residence can refute the ballistic or fingerprint evidence or the content of his statement to the police.

The same applies to the petitioner's argument that counsel's failure to investigate fully the petitioner's activities on the Saturday before the murders prejudiced his defense. The petitioner had stated that he cleaned the victim's car and that they were friendly to one another. At the post-conviction hearing, the petitioner elicited from his former employer the fact that the petitioner cleaned a car that Saturday and that there appeared to be no animosity between the petitioner and the woman in the car. We note that the witness could not remember the make of the car or identify the

24

woman, stating only that she was African-American. However, our review of the record does not lead us to conclude that this testimony would have had any bearing on the outcome.

**B. Investigation of Mental Health Issue**

The petitioner claims that counsel's failure to investigate and develop fully the petitioner's social history and alleged mental defect represents the ineffective assistance of counsel. Specifically, the petitioner contends that the inadequate social history negatively affected the competency and sufficiency issues, as well as his ability to present mitigating evidence.

Initially, we note that the issue of the petitioner's competency to stand trial was determined by the Tennessee Supreme Court on direct appeal. Black, 815 S.W.2d at 173-74. Also, we note that the convicting court accepted the opinion of its own expert, as well as the state's, in deciding that the petitioner was competent to stand trial, despite the conflicting opinion of the defense expert. It is highly unlikely that a more detailed social history would have altered that court's finding. This is evident from the testimony of the petitioner's post-conviction experts that the petitioner understood the various roles of the courtroom players, which is contrary to the trial expert's opinion.

First, we do not believe that the petitioner proved that his trial counsel performed deficiently in investigating and developing evidence regarding the petitioner's mental condition. Although trial counsel testified that they would now be better equipped to investigate a capital defendant's background for mitigation purposes, counsel testified that they interviewed the petitioner, his family, and his acquaintances. Counsel also testified that it was their understanding that mental health experts gathered their own social histories to use for their evaluations. In fact, the experts used by the petitioner at the post-conviction hearing testified that normally they would obtain

their own social history. Dr. Bernet testified that in complex cases, he would rely on counsel for additional information, but he also stated that it was usually the expert who would make the request. Trial counsel in this case testified that their expert did not request any further background information. Moreover, counsel testified that none of their own interviews disclosed any relevant information concerning the petitioner's mental health. Counsel's performance in this case did not fall below that which is required. The petitioner did not offer testimony at the evidentiary hearing from the trial expert regarding the need for a more detailed social history. Moreover, merely because counsel failed to discover indications of partial amnesia does not mean that they were ineffective. The attorneys are not guarantors of the validity of an expert's results. In any event, the petitioner's trial expert did not believe the petitioner was competent, yet the convicting court twice rejected the petitioner's claim.

The petitioner insisted upon pursuing an alibi defense. Neither the petitioner nor his family could provide counsel with any information relative to the petitioner's mental health history. Despite this, counsel presented eight character witnesses along with the testimony of Ms. Jaros. Although Dr. Anchor did not testify, Ms. Jaros was able to convey the substance of Dr. Anchor's evaluation. Ms. Jaros testified at trial that she thought they had a pretty good impression of the petitioner based upon the information they had. In fact, she informed the jury that the petitioner had "these ideas which are falsely held beliefs that might influence his actions in some way . . . . He does not seem to have a conscious recollection of what happened in March [the time of the murders]." She indicated that the petitioner exhibited delusional traits. Thus, counsel did pursue and present evidence regarding the petitioner's mental condition. We believe counsel were not deficient with respect to the petitioner's mental condition issues.

26

Also, we do not believe that the petitioner has shown prejudice. In Goad v. State, 938 S.W.2d 363, 371 (Tenn. 1996), our supreme court listed several factors for courts to consider when examining resulting prejudice in the sentencing phase of a capital trial: the nature and extent of mitigating evidence that was available but not presented, whether substantially similar mitigating evidence was presented, and the effective strength of the aggravators. In the present case, the expert evidence proffered at the post-conviction hearing was similar to that presented to the jury during sentencing. Moreover, given the quality and quantity of the existing aggravating circumstances (T.C.A. § 39-2-203(I)(1), (2), (5), (6), (7), (12) (1982)), we do not believe that such evidence could have altered the verdict.

The trial court in the present case found as follows:

The Court rejects the petitioner's conclusions. First, the petitioner suggests that his trial lawyers somehow failed him because they did not convince the trial court that he was incompetent. Furthermore, the contention now is that somehow the lack of a more detailed social history was the primary failing of defense counsel.

It is true that the petitioner's present counsel found a psychiatrist and psychologist who now say that the petitioner may not have been competent when he stood trial in 1989. It is certainly not the test of ineffective assistance of counsel that trial counsel did not find an expert to say what petitioner would have liked him/her to say. See Pyner v. Murray, 964 S.W.2d 1404, 1418-19 (4th Cir. 1992) (counsel not ineffective for failure to find a psychiatrist that agrees with a certain diagnosis). Trial counsel hired an independent psychologist and psychological examiner. These hired experts did an evaluation of the petitioner which included a social history[,] they reached their own conclusions, and the psychologist testified at a competency hearing and gave the trial judge his best opinion. That opinion was at least sufficient to cause the trial judge to appoint a psychiatrist to do an additional evaluation. The fact that the trial court ultimately made, and the Supreme Court of Tennessee affirmed, a finding that the petitioner was competent to stand trial was not the result of the failings of defense counsel.

The petitioner also seems to suggest that perhaps trial counsel should have tried an insanity defense or at least put on more evidence of the petitioner's "social history" and serious mental illness. The petitioner overlooks the testimony of Pat Jaros before the jury. She was able to not only give her

27

own portrait of the petitioner's mental health, but essentially she repeated Dr. Anchor[']s analysis. Both Dr. Anchor and Ms. Jaros found no support for an insanity defense. Even petitioner's present experts did not testify that he had an insanity defense.

The petitioner's present counsel emphasizes and reemphasizes the failure of trial counsel to provide its expert witnesses with an adequate social history. The argument seems to be that if an adequate social history had been provided then the experts testifying in 1989 would have reached a different conclusion supportive of petitioner's present contention that he was not competent to stand trial and had either an insanity defense or serious mental illness that would have mitigated sentencing. The petitioner says that the social history is the responsibility of defense counsel. The Court notes that both Dr. Anchor and the court appointed evaluators from the local community health center had their own social histories prepared. These histories were relied upon in reaching their opinions. The Court believes that it is more a function of the mental health profession to determine the social history needed than it is the function of the defense lawyers. At the post-conviction hearing, neither Dr. Anchor nor Ms. Jaros testified at all, no less testified that the social history provided them was inadequate or that their opinions would have changed if provided with a "better social history."

Even assuming that trial counsel could have painted the petitioner as more severely disturbed than they did, it remains to be seen how this could have possibly affected the outcome of the trial. The petitioner was found to have six (6) aggravating circumstances including a prior crime of violence, and including his killing of two (2) children. If trial counsel might have submitted more and stronger evidence to the jury about the petitioner's mental health background and history this error was not prejudicial. This case is far from one in which defense counsel offered no mitigating evidence. See Adkins v. State, 911 S.W.2d 334, 354-57 (Tenn. Crim. App. 1995). The Court concludes that if there was error at the trial such error was not of a nature that it could have affected the jury's determination given the strong evidence supporting the six (6) aggravating factors found by the jury.

We conclude that the trial court ruled correctly and that the petitioner has failed to show how the proof preponderates against the trial court's findings.

As a collateral argument, the petitioner contends that the ineffective assistance of Robert Skinner, the attorney who first met with the petitioner at the police station, adds to his present claim of ineffective assistance of counsel. As the petitioner acknowledges, however, the supreme court already determined on direct appeal that

28

Mr. Skinner's representation was not ineffective. Black, 815 S.W.2d at 184-85 (Tenn.

1991). Therefore, this issue has been previously determined under the applicable post-

conviction statute. T.C.A. § 40-30-112(a) (repealed 1995); see House v. State, 911

S.W.2d 705, 711 (Tenn. 1995).

## C. Argument of Prosecutor

Next, the petitioner claims that counsel were ineffective for failing to object

to the following statements made by the prosecutor during closing arguments:

> And what I'm telling you, ladies and gentlemen, is this, we're asking for the death penalty for all three of these deaths. But you know what, if you don't give him the death penalty for those two little girls, for what he did to them -- and I submit to you, based upon the facts and common sense, that you reward him. . . . When that man opened the door to that apartment and walked in there, and he walked through that house, and he walked back to that bedroom, and he took that great big old gun and he killed Angela Clay, as soon as he pulled that trigger, he had a life sentence because he committed murder in the first degree. As soon as he pulled that trigger, at a minimum, he had a life sentence. What he did then was to kill the witnesses, when he killed the two little girls. He took a chance. If I kill them, there are no witnesses, and I may not get caught. And if he doesn't get any more than life, then he's gotten away with it. You've rewarded him for it. He's killed the witnesses to the case, two children, for no reason, and he's going to serve a life anyway he says when he's standing there and he kills her. Why not do the witnesses in? Why not go ahead, just go ahead and just do them in? Ladies and gentlemen, if you don't give him the chair on that, then you've rewarded him.

The petitioner also argues that it was ineffective for counsel not to raise the issue on

direct appeal. In support of his argument, the petitioner relies upon State v. Smith, 755

S.W.2d 757 (Tenn. 1988), and State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994). As the

post-conviction court found, however, these cases are distinguishable from the present

situation. In Smith and Bigbee, the defendants had previously received life sentences

for unrelated murders. The court found prejudicial prosecution arguments informing the

jury of the previous life sentences and stating that the jury would, in essence, reward

the defendants by not imposing the death penalty for the subsequent murders. In the

present case, the petitioner was facing the death penalty in the same trial for three

29

related killings.  Accordingly, as the post-conviction court noted, the jury could not help but have full knowledge of all three sentences it was considering for the three murders.  Thus, the concern expressed by the court in <u>Smith</u> and <u>Bigbee</u> that the jury should not base its decision on unrelated sentences is not present in this case.

Trial counsel acknowledged at the evidentiary hearing that the above-quoted argument was improper.  Although they did not proffer a reasonable explanation for not voicing an objection, counsel stated that they did not raise the issue on appeal because they considered it to be waived.  The state argues that counsel's failure to object to the argument was not improper.  According to the state, the prosecutor's statements were made to support the aggravating circumstance that the murders of the children were "committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution."  T.C.A. § 39-2-203(I)(6) (1982).  The state argues that these statements merely persuaded the jury that great weight should be given to this particular aggravator.

The trial court found the following:

> This Court is not prepared to say that the failure to object to this argument is ineffective assistance of counsel. The Court, however, need not decide that issue.  If there was a mistake, it was not prejudicial.  The jury here only imposed the death penalty on one of the murders and a life sentence on the other two.  Secondly, in light of the jury's finding of six (6) aggravating circumstances, it is not possible to conclude that this error was prejudicial. <u>See</u> <u>State v. Walker</u>, 910 S.W.2d 381, 397 (Tenn. 1995) (argument in death penalty case that imposition of a life sentence means for defendant that "he wins again" was found not proper but not prejudicial).

We believe that the trial court made the proper finding.  Even if counsel should have objected to the argument, it is unlikely that the objection would have had any effect on the jury's decision.  The state was arguing for three death sentences.  Moreover, in the statements, the state was talking about the killing of <u>both</u> children.  However, the jury returned only one death sentence.  This sentence was supported by

30

six aggravating circumstances. The jury's verdict is supported by the evidence in the record. The petitioner has failed to show how the evidence preponderates against the lower court's finding in this respect.

### D. Instruction on Parole Eligibility

The petitioner also contends that trial counsel were ineffective for failing to request the trial court to instruct the jury regarding parole eligibility. However, we note that our supreme court has concluded that there is no error in not giving such an instruction. See State v. Bush, 942 S.W.2d 489, 503-04 (Tenn. 1997).

### E. Voir Dire

The petitioner argues that trial counsel were ineffective for not objecting to the trial court's description of mitigating evidence during voir dire. In attempting to provide examples of mitigation, the judge mentioned "serious mental disorder" and "things favorable to the defendant." As the state asserts, these statements were not instructions to the jury. In fact, the petitioner does not contest the instructions actually given to the jury before deliberation. The record reflects that the trial court properly instructed the jury according to the mandates of the law. The jury is presumed to follow the court's instructions. See, e.g., State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). No prejudice to the petitioner has been shown.

### F. Admission of Statements

The petitioner next contends that trial counsel should have further investigated the possible suppression of his statements to the police. Specifically, he argues that counsel should have considered whether the petitioner was competent to waive his right against self-incrimination. The admissibility of the statement provided in the presence of Mr. Skinner was addressed on direct appeal, Black, 815 S.W.2d at 184-85, and has, therefore, been previously determined. T.C.A. § 40-30-112(a) (1990).

Although counsel challenged the admission of both recorded statements, the petitioner argues that their failure to raise the competency issue in this respect was fatal to his defense. However, as discussed above, counsel were not ineffective for failing to investigate the petitioner's mental health further. Moreover, the petitioner has failed to present any evidence that would support suppression of the statements.

Similarly, the petitioner contends counsel were ineffective for failing to seek redaction of portions of the petitioner's statements in which the prosecutor questioned whether the petitioner was lying. As the state notes, these isolated remarks by the prosecutor are found in a forty-three-page statement. Further, the prosecutor and detective were simply asking the petitioner why he was changing his story. The petitioner indicated that he was uncomfortable earlier talking with the detectives alone. Although the prosecutor used the word "lie," the petitioner was able to explain his position. Moreover, at one point, Mr. Skinner requested the prosecutor to retract her accusation. Accordingly, we cannot find any prejudice.

### G. Plea Negotiations

The petitioner claims that counsel were ineffective for failing to initiate plea negotiations with the prosecutor. Whether counsel were ineffective in this respect is irrelevant, because the petitioner has failed to show prejudice. Mr. McNally's testimony at the evidentiary hearing suggests that Mr. Alderman may have discussed this matter with the prosecution. However, the petitioner neglected to ask lead counsel whether he, in fact, had such discussions. The fact that Mr. McNally did not discuss the matter does not prove, by a preponderance of the evidence, that Mr. Alderman did not. Moreover, the prosecutor did not testify at the post-conviction hearing. Accordingly, the petitioner has not shown that the state would have accepted a plea. No prejudice has been shown.

## H. Expert Witness

The petitioner claims that counsel should have subpoenaed Dr. Anchor to testify at the sentencing phase and should have insisted on a better expert witness to relay the mental health findings. Counsel testified at the evidentiary hearing that they chose the services of Dr. Anchor because they used him before, and he was one of a few experts they knew who was willing to handle criminal cases. Moreover, Mr. McNally testified that they chose a psychologist rather than a psychiatrist because it was his experience that psychologists communicated better to juries. Dr. Anchor testified at the competency hearing before trial and was the only expert associated with this case who believed the petitioner was incompetent. In addition to Dr. Anchor, the defense relied upon the services of Pat Jaros, a psychological examiner. Ms. Jaros and Dr. Anchor had a working relationship, and Ms. Jaros conducted the tests upon which Dr. Anchor relied for his evaluations.

Sometime before trial, counsel realized Dr. Anchor would be unavailable to testify due to a scheduling conflict. Counsel filed a motion to continue based upon this, but the court denied the motion. Although the court agreed to additional funds for another psychological expert, the defense decided to allow Ms. Jaros to testify instead. With the court unwilling to grant a continuance, counsel believed they did not have sufficient time to replace the work that had already been performed. And given the fact that Ms. Jaros worked with Dr. Anchor on this case, counsel believed that she could convey the crux of Dr. Anchor's findings. Counsel were concerned that Dr. Anchor would be hostile on the witness stand if they forced him away from his professional conference in Hawaii. The trial court allowed Ms. Jaros to testify as an expert witness, and she conveyed to the jury Dr. Anchor's evaluation concerning the petitioner's mental health.

Counsel's performance under these circumstances was not deficient. Counsel were able to locate an expert who believed the petitioner was incompetent. The trial court, however, ultimately disagreed with this opinion. We believe counsel made a reasonable trial decision. Although Dr. Anchor did not testify, the defense was able to present an expert witness who conveyed to the jury the essential findings of the expert evaluations.

## I. Competency Hearing

The petitioner also claims that counsel were ineffective for failing to call Palmer Singleton, a trial attorney, to testify on behalf of the petitioner at the pretrial competency hearing. During the competency hearing, counsel offered Singleton's affidavit which stated, in effect, that he believed that the petitioner was unable to assist his attorneys. Mr. Singleton did not testify, however, and the trial court refused to consider his affidavit. Although Mr. Singleton did not testify, Mr. Alderman, an experienced attorney, testified at the hearing to the same effect. The petitioner argues that the testimony of Mr. Singleton may have produced a different result at the competency hearing. This argument does not satisfy his burden in this case. It is highly unlikely that the trial court would have been persuaded by cumulative testimony from another attorney in light of the expert opinions available, including the petitioner's own expert who believed the petitioner was not competent. The petitioner has not shown how the outcome of the hearing would have been different if Mr. Singleton had testified.

The petitioner also contends that counsel erred to his detriment in failing to introduce notes written by the petitioner during voir dire. The petitioner claims the notes would have rebutted some of the trial court's comments that the petitioner was alert during voir dire, conferred with counsel, and even took notes. Contrary to the petitioner's description, the notes are not "primarily meaningless doodles or . . .

34

relatively meaningless observations." The notes contain what appears to be the petitioner's comments on each prospective juror (the last page of the eleven contains words from a prayer). Some examples are: "putting words in the person's mouth," "he's a mason on the stand and the DA is a mason also," "the right age limit, she will work out good on this case," "He's a pretty good example. He will obey the law," and "he was very truthful by going by the law." As the notes reflect, the petitioner actually noticed that one of the prosecutors was wearing the insignia pin for an organization in which one of the prospective jurors belonged. We believe that introduction of these notes would have done nothing more than support the trial court's conclusion. Counsel were not ineffective in this respect.

**J. Evidence of Prior Crime**

Next, the petitioner claims ineffective assistance of counsel due to counsel's failure to object to the testimony of Bennie Clay detailing the facts surrounding the petitioner's guilty plea for shooting Clay. The record reflects that the trial judge conducted a conference in his chambers prior to the testimony of Clay. It also indicates that the trial court was going to allow Clay to testify about the incident but was not going to allow unnecessary detailed testimony of the circumstances. Clay's testimony apparently goes beyond describing the nature of the incident, as counsel voiced an objection after the testimony was solicited. Counsel also moved for a mistrial, but to no avail. The petitioner now alleges counsel erred to his prejudice.

While it is generally true that facts of a previous unrelated conviction are inadmissible in a later trial, it is also true that this type of evidence may be relevant to an issue on trial. See, e.g., State v. Goad, 707 S.W.2d 846, 850 (Tenn. 1986); State v. McKay, 680 S.W.2d 447, 452 (Tenn. 1984). With the state proving that the same gun that was used to kill the victims in the case at hand was used by the petitioner to shoot Clay, certain facts of the petitioner's prior conviction were certainly relevant. The

petitioner admitted to shooting Mr. Clay, and the bullets removed from Mr. Clay's body matched those removed from the victim's body in this case. Accordingly, the jury was well aware of the petitioner's actions toward Clay. Although Clay's portrayal of these events on the witness stand may have been somewhat colorful, counsel's failure to object at the time of the testimony did not result in the admission of testimony more detrimental than what would have been allowed otherwise. Prejudice has not been shown.

The petitioner claims counsel were overworked at the time of this case and could not adequately prepare and present the issues raised. Counsel, however, testified that they maintained a normal caseload at the time of this trial. Moreover, the trial court appointed the office of the public defender in compliance with the then existing legal standards. The petitioner has failed to show how counsel were ineffective or how any alleged errors on counsel's behalf prejudiced him. Accordingly, we hold that the evidence does not preponderate against the trial court's findings on this issue.

### III. POST-CONVICTION HEARING

Next, the petitioner claims that he was denied a full and fair hearing on his petition for post-conviction relief. Specifically, the petitioner contends the trial court did not provide the petitioner adequate time or resources to prepare for the evidentiary hearing.

A pro se petition for post-conviction relief was filed on May 19, 1992. On May 21, 1992, counsel was appointed, and an amended petition was filed on September 22, 1992. Dr. Bernet initially conducted an interview of the petitioner and made written conclusions regarding the petitioner's mental health on November 13, 1992. Counsel filed a motion for support services on February 11, 1993. In this motion, counsel sought funds in the amount of $5,100 for Dr. Bernet, $3,300 for Dr.

Gillian Blair, a forensic psychologist, $12,900 for a professional investigator, and $793 for a jury expert. On February 18, 1993, the trial court found the total amount of requested services unreasonable, but authorized $5,500 for supportive services for use as allocated by the petitioner. The state sought and was granted an interlocutory appeal, but the trial court's order was affirmed. State v. Byron Lewis Black, No. 01C01-9303-CR-00105, Davidson County (Tenn. Crim. App. Sept. 27, 1995).

The evidentiary hearing was scheduled for October 21, 1996. On March 28, 1996, the court amended its earlier order and authorized $4,960 to be used for the investigation of the petitioner's background. The petitioner had also requested $5,100 for Dr. Bernet, $4,375 for a clinical psychologist, and $1,500 for a jury expert. On April 8, 1996, the court authorized another $2,500 for the medical expert (Dr. Bernet) to evaluate the investigation material discovered. However, on May 14, 1996, the trial court denied the petitioner's request for additional funds of $2,500 for the medical expert. Another motion for support services was denied on June 4, 1996. On July 25, 1996, the court continued the hearing from October until January 21, 1997. Counsel for the petitioner filed a motion to withdraw on October, 9, 1996. In support of the motion, counsel stated that he suffered a heart attack in July and was thus unable to prepare and present the petitioner's case effectively. The court granted the motion on October 22, 1996, and appointed the post-conviction defender as counsel of record for the petitioner.

New counsel filed a motion to continue on December 2, 1996. The court granted the motion and continued the hearing until March 3, 1997. The petitioner filed a motion for further support funding on February 10, 1997. On February 13, 1997, the trial court authorized an additional $6,800 for the services of Dr. Bernet, $2,000 for the services of Dr. Auble, and $167.50 for plane fare for Mr. Makin, the expert attorney. On February 23, 1997, another motion to continue was filed by counsel. This motion was

37

denied after a hearing on February 26, 1997. Another motion for a continuance was denied the day of the hearing. However, the trial court did grant the petitioner a continuance until April 30, 1997, to present his expert proof. The petitioner sought interlocutory review of the trial court's order of March 3, 1997, denying the motion for continuance, but this Court, in an order dated March 4, 1997, determined that the trial court did not abuse its discretion by denying the petitioner's renewed motions for a continuance. On April 27, 1997, the petitioner filed another motion to continue and a motion for more support services. The trial court entered the following order:

> The motion for a continuance is DENIED. Counsel for the petitioner have had considerable time to prepare for this proceeding. The petitioner's counsel continues to say that this is a death penalty case and that therefore he should be given even more time. The petitioner's counsel have had adequate time to prepare. The Court has already continued this matter numerous times, including a continuance from a January hearing date to March 3, 1997, and then after hearing part of the proof, the Court continued the remainder of the hearing until April 30, 1997 to allow counsel time to present additional testimony. The Court has also considered the affidavit of Dr. William Bernet and Dr. Pamela Auble filed in support of the fifth motion for support services. These affidavits indicate that these expert witnesses could testify on April 30, 1997 regarding the mental health issue in this case. The Court further notes the psychologist that did not testify in the 1989 trial, Dr. Kenneth Anchor would also be available to testify. Prejudice to the petitioner, if it exists, is the choice of counsel, not the court. Courts cannot be extorted into continuance after continuance after continuance just because the case is a death penalty case. At some point a hearing must be had and a decision rendered. That counsel are disinclined to present what they have is not a reason for granting of a continuance. The motion for a continuance is DENIED.

> The fifth ex parte motion for support services is also DENIED. The Court has previously granted by prior orders considerable resources to the petitioner. No additional resources are necessary in order to provide the petitioner a full and fair hearing.

The petitioner correctly notes that he must be "afforded every opportunity to present evidence and argument" at a "full and fair hearing" on his petition for post-conviction relief. House v. State, 911, S.W.2d 705, 711 (Tenn. 1995); see also T.C.A. § 40-30-112 (1990) (repealed 1995). However, after reviewing the post-conviction court's

findings in light of the entire record on appeal, we conclude that the petitioner was afforded this opportunity.

In 1992, original post-conviction counsel obtained the services of Dr. Bernet, who interviewed the petitioner and reviewed the background information and records pertaining to the petitioner's case. Although a decision on the initial motion for support services was delayed, the court finally authorized funding on March 28, 1996, and April 8, 1996. Original counsel did not file a motion to withdraw until October 9, 1996. Counsel suffered a heart attack sometime in July, but this was over three months after the initial support funds were granted. Furthermore, after original counsel was permitted to withdraw, subsequent counsel were appointed and given the work performed by original counsel since 1992. In addition, new counsel obtained a continuance from January 1997 to March 1997. Although new counsel were appointed in October 1996, they did not file any motion for additional support services until February 10, 1997, just before the hearing on the petition.

The petitioner claims, in part, that he was denied the ability to conduct a thorough background investigation to support his post-conviction claims. The record does not support this claim. The petitioner was granted investigative funds almost one year before the evidentiary hearing. The petitioner's suggestion that original counsel's health problems hindered the case is not supported by the record. Nothing the trial court did or did not do prevented the investigator from moving forward with her investigation before, during, or after counsel suffered the heart attack.[2] The funds were for the work of the investigator and medical expert, not the attorney.

---

[2] Although the investigator stated in an affidavit dated November 26, 1996, that she had not completed her investigation, the hearing in this matter was not until March 3, 1997, and April 30, 1997, over three months later. In fact, the investigator stated that she was initially contacted by the original attorney on March 14, 1996.

The trial court continued the hearing date in this matter almost five months from the original setting and authorized additional support services on February 13, 1997. The petitioner filed several more motions to continue shortly before the scheduled hearing, but the trial court denied these after hearing arguments on the merits of the motions. The trial court did, however, agree to continue hearing the testimony of the petitioner's expert witnesses until April 30, 1997, over two months after authorizing the additional funds. On March 3, 1997, the first day of the evidentiary hearing, the petitioner sought appellate review in this court of the trial court's denial of the motions to continue. This court stated that the trial court "did not abuse its discretion by denying the petitioner's renewed motion for continuance." This court further noted that abuse would have resulted if the court required the petitioner to present his expert proof at that time.

In his final motion for support services and a continuance, the petitioner indicated that additional time was needed in order for him to undergo an EEG and MRI. According to Dr. Bernet, there was a reasonable medical probability that the petitioner suffered from a form of amnesia. Moreover, Dr. Bernet testified that the petitioner would have had problems assisting counsel in the preparation of his defense. Dr. Auble also testified that the petitioner had characteristics of a dissociative disorder, possibly amnesia. The affidavits of Drs. Bernet and Auble attached to the petitioner's motion state that the additional time and money for the EEG and MRI were necessary to document the source of the petitioner's alleged condition. Their statements suggest that the results from the EEG and MRI would either substantiate their opinions or discount the existence of an organic brain injury or disease. Given this testimony, we believe that the petitioner did not suffer prejudice from the trial court's refusal to grant even more time for evaluation. The petitioner was able to present testimony from both experts concerning his mental condition. If the results of the tests were negative or inconclusive, the expert testimony would have been suspect.

40

Regardless, the trial court did not believe trial counsel were ineffective for failing to pursue the mental health issue. As discussed earlier, the fact that post-conviction counsel could possibly reveal undiscovered medical problems does not mean that trial counsel were ineffective for failing to pursue this. Additional time or funding would not have influenced the outcome.

Contrary to the petitioner's claim, the petitioner was granted substantial time and money to pursue his post-conviction petition, and nothing in the record preponderates against the trial court's finding in this respect. We conclude that the trial court did not err in imposing the time constraints and expert service limitations. The record reflects that the petitioner was afforded a full and fair hearing.

## IV. CONSTITUTIONALITY OF THE DEATH PENALTY

### A. T.C.A. § 39-13-204(i)(5)

The petitioner contends that the aggravating circumstance dealing with a heinous, atrocious and cruel killing, T.C.A. § 39-43-204(i)(5), is unconstitutional as applied in his case. He asserts that it is vague and overbroad, is contrary to federal precedent, and resulted in "double counting" in terms of the same acts that constitute the murders being used to prove the circumstance's existence.

In the direct appeal, our supreme court found this aggravating circumstance as instructed to be constitutional. Black, 815 S.W.2d at 181-82. Also, the court stated:

> In the instant case, the trial court's definitions of the terms "heinous," "atrocious," "cruel," "depravity" and "torture" removed any vagueness and narrowed the class of persons eligible for the death penalty to those who have committed more aggravated murder. Torture was defined in [State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985)], and the jury so instructed, as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the

41

> murderer, because the state of mind of one who willfully inflicts
> such severe physical or mental pain on the victim is depraved."

Id. at 181. Also, the trial court concluded that the facts justified the application of this aggravating circumstance. We are bound by our supreme court's determinations in the direct appeal. Also, no federal authority exists that mandates a different result in this case.

## B. Death Penalty

The petitioner asserts that the death penalty in the present case is unreliable and violates the values recognized and protected by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. However, on the petitioner's direct appeal, our supreme court reaffirmed its holding that the death penalty statute in Tennessee does not violate either the federal or state constitution. Black, 815 S.W.2d at 185.

## C. Electrocution

The petitioner contends that electrocution is cruel and unusual punishment that violates the Eighth Amendment to the United States Constitution. However, on his direct appeal, the Tennessee Supreme Court held that "electrocution is a constitutionally permissible method of execution." Black, 815 S.W.2d at 179. This issue has been previously determined, and we are bound by our supreme court's decision. We also note that T.C.A. § 40-23-114 (1998 Supp.) gives the petitioner the option of lethal injection.

## D. Fundamental Right to Life

The petitioner contends that his death sentence unconstitutionally impinges upon his fundamental right to life, secured by the United States Constitution and the Tennessee Constitution. Essentially, this is a due process argument. In this respect, the Tennessee Supreme Court has consistently held that the death penalty

42

does not violate due process and does not impermissibly infringe upon the right to life. See State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997).

## CONCLUSION

The record supports the trial court's findings and conclusions. In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
Joe G. Riley, Judge


_____
Thomas T. Woodall, Judge